**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **CONNECTICUT GENERAL LIFE INSURANCE COMPANY; CIGNA HEALTH AND LIFE INSURANCE COMPANY** | |
| **PLAINTIFFS,** | CIVIL NO. 3:14-cv-01519-SRU |
| **V.** | JANUARY 16, 2015 |
| **HEALTH DIAGNOSTIC LABORATORY, INC.** | |
| **DEFENDANT** | |

## PLAINTIFFS' AMENDED COMPLAINT

Plaintiffs Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company (collectively, "Cigna") file this Amended Complaint against Defendant Health Diagnostic Laboratory, Inc. ("HDL") and allege as follows:

## INTRODUCTION

1.      This case arises out of a scheme by HDL to submit fictional, excessive charges for routine healthcare services to Cigna which bear no relation to HDL's actual charges to patients. By means of that scheme, HDL has unlawfully obtained approximately $84 million from Cigna and the benefit plans it serves.

2.      Cigna is a Connecticut managed care company that administers employee health and welfare benefit plans (including, but not limited to, plans insured by Cigna). It is part of Cigna's responsibilities to those plans to control overall healthcare costs. One way Cigna discharges that responsibility is by entering into agreements with networks of healthcare providers, under which the providers agree to accept fixed rates for services in consideration of

other benefits, including access to plan members. In the plans at issue here, plan members remain free to use providers outside these networks, but they are given incentives to remain in the network, and thereby to lower costs for the plan as a whole.

3.     One such incentive involves requiring plan members to bear a portion of the cost (either through co-payment, co-insurance or deductible obligations) of treatment by out-of-network providers, who generally charge higher rates than doctors in the network. Without this obligation, out-of-network providers could submit charges to healthcare plans which have no relation either to the provider's actual costs or to the actual market for medical services, and members would have no incentive to avoid those providers.

4.     HDL, a provider of routine laboratory services that does not participate in Cigna's provider networks, undermines these safeguards by means of a fraudulent "fee forgiving" scheme. HDL lures patients from health plans that are administered and/or insured by Cigna by misrepresenting those patients' responsibilities under the plans, by promising not to collect any co-payment, co-insurance or deductible obligation, and by further promising not to seek reimbursement from the patient for any other portion of its bill that the plan does not cover. HDL then misleadingly bills Cigna and the plans themselves at exorbitant and unjustified rates. The rates HDL submits to Cigna are fictional rates that misrepresent what HDL actually intended to collect.

5.     Indeed, courts have referred to the charges submitted by fee-forgiving providers like HDL as "phantom" charges.

6.     As an example, for one of the patients described below, HDL submitted "charges" of $2,979.00 to Cigna. Based on these charges, the patient's cost-sharing responsibilities under his or her plan were $649.40. However, HDL charged the patient ***nothing***.

7.      "Fee forgiving" of this kind has long been recognized as a variety of medical billing fraud. More than two decades ago, the American Medical Association advised its members:  "[P]hysicians should be aware that … [r]outine forgiveness of waiver or copayments may constitute fraud under state and federal law."  *See* AMA Ethics Advisory Opinion 6.12 – Forgiveness or Waiver of Insurance Copayments (June 1993) (available at:  http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion612.page).   In the context of the federal Medicare program, the Department of Health and Human Services reached the same conclusion:  "Routine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in … false claims … [and] excessive utilization of items and services paid for by Medicare."  HHS OIG Special Fraud Alerts,          (Dec.          19,          1994)          (available          at https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html).

8.      The effect of HDL's scheme is to deceive health benefit plans into paying far more for services than the plans are obligated to pay. But misleading plan members is also essential to the scheme. By convincing patients that HDL offers services at little or no cost (when, in fact, HDL was artificially increasing the cost of healthcare to Cigna and its clients), HDL increases the volume of its business and, at the same time, increases the harm to Cigna and the plans it serves.

9.      Cigna was only able to confirm HDL's fraudulent billing practices through a special investigation of HDL, after which Cigna began reducing or denying payment for claims submitted by HDL.

10.      But before confirming HDL's fraudulent practices, HDL induced Cigna into paying it approximately $84 million through its fee-forgiving scheme.

11.     In this action, Cigna seeks to recover the payments made to HDL, and to prevent HDL from continuing its fraudulent billing scheme against Cigna.

12.     By bringing this action, Cigna seeks to ensure that its clients and plan members are charged only appropriate amounts for services rendered and thereby help to maintain the affordability of healthcare coverage for individuals and employers.

## PARTIES

13.     Plaintiff Connecticut General Life Insurance Company is a company organized under the laws of the State of Connecticut, with its principal place of business in Connecticut.

14.     Plaintiff Cigna Health and Life Insurance Company is a company organized under the laws of Connecticut, with its principal place of business in Connecticut.

15.     Defendant Health Diagnostic Laboratory, Inc. is a Virginia corporation with its principal place of business in Richmond, Virginia.

## JURISDICTION AND VENUE

16.     This Court has personal jurisdiction over HDL, a Virginia corporation, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.*, and its nationwide service of process provision, 29 U.S.C. § 1132(e)(2).

17.     This Court also has personal jurisdiction over HDL because HDL systematically and continuously conducts business in Connecticut and otherwise has minimum contacts with this State sufficient to establish personal jurisdiction. Upon information and belief, HDL actively solicits providers and patients in Connecticut and maintains substantial commercial relationships and agreements with providers and laboratories in Connecticut, and derives revenues from services rendered in Connecticut. Upon information and belief, HDL specifically targets customers in Connecticut through the user-portal on its website, which permits providers and

patients to access personal account information. In addition, this Court has personal jurisdiction over HDL pursuant to 29 U.S.C. § 1132(e)(2).

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States. Specifically, Plaintiffs assert claims in this case that arise under ERISA. The Court has jurisdiction over Cigna's remaining claims pursuant to 28 U.S.C. § 1367, because the state and common law claims alleged herein are so related to the federal claims that they form part of the same case or controversy. In addition, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity between Plaintiffs and Defendant, and the amount in controversy substantially exceeds $75,000.

19.     Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b), because HDL conducted and continues to conduct business in Connecticut. In addition, the electronic claims submitted by HDL to Cigna are routed through Cigna's headquarters in Bloomfield, Connecticut. Venue is also proper pursuant to 29 U.S.C. § 1132(e)(2), because plans at issue are administered in this District.

## FACTUAL BACKGROUND

### *Relevant Facts Regarding Managed Care and Cigna-Administered Plans.*

20.     Cigna, among other things, insures and administers employee health and welfare benefit plans.

21.     The majority of Cigna-administered plans are Administrative Services Only ("ASO") plans funded by the employers who sponsor them. Cigna is a fiduciary for these plans in its role as the plans' claims administrator. The spreadsheet attached as Exhibit A contains the

plans at issue, including both ASO and fully-insured plans, and lists the plan sponsor for each plan.[1]

22.     Certain Cigna entities also offer fully-insured plans, which are funded by Cigna. Cigna also serves as the plans' claims administrator for fully-insured plans.

23.     Regardless of the type of plan funding, Cigna is a fiduciary of each of the plans at issue, as it exercises discretionary authority over plan assets and plan administration, by, among other things, making benefits determinations and paying benefit claims. In this fiduciary capacity as a claims administrator, Cigna has processed claims and/or addressed appeals on behalf of all of the plans at issue. The plans at issue explicitly provide Cigna with the discretionary authority to calculate benefits and administer the plans. *See, e.g.,* Ex. B at 41 ("CG, in its discretion, will calculate Covered Expenses."); *id.* at 53 ("**Discretionary Authority:** The Plan Administrator delegates to CIGNA the discretionary authority to interpret and apply plan terms and to make factual determinations in connection with its review of claims under the plan. Such discretionary authority is intended to include, but not limited to, the determination of the eligibility of persons desiring to enroll in or claim benefits under the plan, the determination of whether a person is entitled to benefits under the plan, and the computation of any and all benefit payments. The Plan Administrator also delegates to CIGNA the discretionary authority to perform a full and fair review, as required by ERISA, of each claim denial which has been appealed by the claimant or his duly authorized representative.").

24.     Regardless of the type of plan funding, all of the plans at issue authorize Cigna to recover any overpayments made by the plans on the plans' behalves. *See, e.g.,* Ex. B at 41

---

[1]     Because of the commercial sensitivity of the information contained in Exhibit A, as well as to address HIPAA identifiers, Plaintiffs have filed a redacted version herewith, and have produced an unredacted version to Defendant.

("Recovery of Overpayment: When an overpayment has been made by CG, CG will have the right at any time to: (a) recover that overpayment from the person to whom or on whose behalf it was made; or (b) offset the amount of that overpayment from a future claim payment.").

25.     This overpayment recovery provision creates an equitable lien by agreement over any overpayments made by Cigna. The provision puts plan members (and providers, as explained below) on notice that any overpayment made by Cigna will be recoverable (i.e., subject to a lien) as soon as the overpayment is made.

26.     The overpayment plan provisions discussed above apply equally to providers when a plan member assigns his or her claim for reimbursement to the provider. The plans generally allow a member to assign his or her claim for reimbursement to a provider, with Cigna's consent. *See, e.g.,* Ex. B at 41. When the provider in turn submits a claim to Cigna, it indicates that the claim for benefits has been assigned. *See, e.g.*, Exhibit C (representative claim record submitted by HDL indicating benefits have been assigned). When a member assigns a claim to a provider, the provider stands in the shoes of the member and is eligible for reimbursement only to the extent the member would have been in the absence of an assignment. Moreover, the provider is on notice of the provisions governing reimbursement—including cost-share requirements, the exclusions for amounts that would not have been charged in the absence of insurance or that members are not obligated to pay—and the recovery of overpayments.  Upon information and belief, each of HDL's patients have assigned their benefit claims to HDL, as indicated on the claim submission forms that HDL submits to Cigna for reimbursement. *See, e.g.,* Ex. C.

27.     Accordingly, when HDL accepts assignment of a plan member's claim without charging or collecting the member's cost-share requirements, HDL is not entitled to

reimbursement for the claim, just as a plan member would not be entitled to reimbursement if she submitted the claim herself without having satisfied her cost-share obligation.

28.     The majority of the plans under which HDL sought benefits are governed by ERISA. Some of the plans at issue are not governed by ERISA, because, for example, they are sponsored by governmental or church employers. The spreadsheet attached as Exhibit A indicates whether each plan is governed by ERISA.

29.     Most of the plans at issue offer members the choice of receiving services either from health care providers that contract with Cigna to participate in Cigna's provider network or from providers outside of that network.

30.     Cigna-administered health plans reimburse their members for certain healthcare costs, defined in the plans as "Covered Expenses." When a Cigna plan member receives medical services, Cigna determines what part of the member's cost is considered for coverage by the plan, known as the "allowed amount."

31.     There are different types of member responsibility, including deductibles (minimum thresholds that the member must pay before the plan will pay any portion of the covered charge), benefit limits, co-payments (fixed rates for covered services), and co-insurance (percentages of providers' charges).

32.     These member cost-sharing responsibility amounts are calculated as a percentage or portion of the allowed amount.

33.     If a member receives a service from a provider that contracts to be part of Cigna's network (an "in-network" or "participating" provider), the plan pays the provider the amount that the provider agreed to accept (the provider's contracted network rate), and the member pays any

applicable co-insurance, co-payments, and deductibles based on the coverage for in-network services specified in the member's plan.

34.     In exchange for agreeing to accept fixed, network rates for their services, participating providers receive certain benefits, including access to members of Cigna-administered plans as a source of patients.

35.     Just as it benefits participating providers, Cigna's network arrangements benefit employers and plan members by controlling overall health care costs and increasing the quality of medical care. In addition, members benefit from obtaining services from a participating provider, because participating providers agree not to bill them for any difference between the plan's reimbursement to the participating provider and the provider's billed charges.

36.     In contrast, if a member receives a service from a provider who does not contract to be part of Cigna's provider network (an "out-of-network" or "non-participating" provider), the provider can charge whatever it likes for its services—and out-of-network rates are generally higher than contracted rates. Furthermore, the provider may bill the member for any portion of the provider's charges, over and above the member's cost-sharing responsibility under the plan, which the plan does not reimburse.

37.     To make out-of-network benefits an affordable option for the employers sponsoring them, Cigna's plans contain various financial incentives for members to choose participating providers and to share the increased costs associated with obtaining out-of-network services.

38.     One of the key ways in which Cigna's plans allocate out-of-network costs between employees and employers is through co-insurance—a percentage of the amount that the plan covers (or "allows") that the member is required to pay towards the cost of that service. The

co-insurance that members must pay towards out-of-network services is usually much higher than the co-insurance (if any) they must pay towards in-network services.

39.     This co-insurance requirement underlies the entire concept of out-of-network benefits. It sensitizes members to the true costs of out-of-network services, ensuring that, if a member receives such a service, he is willing to pay a greater portion of that expense out of his own pocket. If patients did not share in these costs, then they would have no financial incentive to moderate their demand for out-of-network services or to consider the higher costs of any particular out-of-network service, leading to increased costs for the plan.

40.     Similarly, without co-insurance requirements, out-of-network providers would have no incentive to keep their rates competitive. Generally, patients would not receive services from an out-of-network provider that charges unreasonably high rates, because the member would have to pay a fixed portion of that unreasonable rate to satisfy his or her co-insurance and cost-sharing responsibilities.

41.     Cigna's plans have several mechanisms to ensure that members receiving out-of-network services pay their required co-insurance and that non-participating providers do not waive it.

42.     For instance, the portion of the Cigna-administered plans labeled "Exclusions, Expenses Not Covered and General Limitations" state that the plans do not cover "charges which you [the member] are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan."  *See, e.g.,* Ex. D at 37-38.  This language is taken from Exhibit D, the plan covering Patient A, who is one of the patients described below. The language is representative of the language found in Cigna-administered plans covering HDL's patients.

43.     Here, for example, if HDL submits "charges" of $10,000 to Cigna, but does not obligate the patient to pay the portion of that amount that is his or her responsibility under the plan; if the provider does not bill the patient for those "charges;" or if it does so only because of the coverage available under the plan, and not for the purpose of collecting any portion of the charges from the patient, then the $10,000 charges are "phantom" charges, and the plan excludes coverage for them.

44.     As an additional safeguard, Cigna-administered plans generally limit reimbursement for out-of-network services to the "Maximum Reimbursable Charge" for "covered services," which may be no more than the "provider's normal charge for a similar service or supply."  This provision explicitly excludes from coverage any charges, "to the extent that they are more than Maximum Reimbursable Charges."

45.     Thus, if HDL submits a $10,000 bill for services, but HDL has actually agreed to accept a substantially lower amount in full payment of its services, HDL's bill exceeds its "normal charge" for those services, and the excess is not covered.

46.     Finally, Cigna-administered plans do not automatically cover or reimburse a member for every "charge" the provider submits to Cigna; rather, the plans cover a portion of any "Covered Expenses," which the plans define as "expenses incurred" by or on behalf of the member. Covered Expenses are in turn subject to the applicable co-insurance, co-payments, and deductibles set forth in the plans. Cigna-administered plans define co-insurance as "the percentage of charges for Covered Expenses that an insured person is ***required*** to pay under the plan." Thus, Cigna-administered plans expressly require members to satisfy their cost-sharing responsibility (i.e. co-insurance, co-payments, and deductibles) in order for charges to be covered under the plans.

47.     Thus, where HDL has agreed in advance that it will not require the plan member to pay either the member's cost-sharing responsibility or any other portion of HDL's "charges" that the plan does not cover, the plan member has "incurred" no expenses at all, and the plan is not obligated to pay HDL.

### *HDL's Fraudulent Fee-Forgiving Scheme*

48.     HDL has developed a business model designed to game the healthcare system by submitting grossly inflated, phantom "charges" to Cigna that do not reflect the actual amount HDL bills patients. The outline of HDL's scheme is simple. HDL misrepresents to members of Cigna-administered plans that they may receive services from HDL without incurring any financial obligation, and that Cigna will be responsible for the cost of services delivered under these conditions. After luring plan members in this way, HDL submits charges to Cigna at astronomical rates, which are much higher than the "normal charge" HDL actually intends to accept as payment in full. Cigna then relies on the representations in HDL's bills, by paying more for HDL's services than it is obligated to pay under the relevant plans.

49.     HDL typically does not join provider networks of major managed care companies, like Cigna, instead opting to remain an "out-of-network" provider.

50.     HDL entices members to use its out-of-network services by expressly promising (i) not to collect any part of the members' cost-sharing responsibility, and (ii) not to seek to recover any other portion of its "charges" for which it fails to obtain reimbursement from the plan.

51.     For example, one HDL document directed to patients (attached hereto as Exhibit E) states:

- HDL, Inc. will accept the amount your insurance company allows for each diagnostic.

- In other words, your 'out-of-pocket' cost is ZERO for initial and follow-up testing.

- HDL, Inc. takes all the risk if your insurance company does not pay for the ordered diagnostics.

52.     This HDL document goes on to explain to patients how to interpret the explanation of benefits (or "EOB") forms patients receive from their insurance company. (*See id.*)

53.     Typically, EOBs include a section titled "Patient Responsibility," which is the amount the member is responsible for paying the provider after the plan has covered its portion of the provider's charges. Remarkably, HDL tells patients with respect to the "Patient Responsibility" amount that "[p]aying this amount is not the patient's responsibility." (*Id.*)

54.     Thus, as part of its fraudulent scheme, HDL affirmatively misleads patients about the nature of their health insurance benefits.

55.     Another HDL brochure likewise assures patients that "[l]ab costs and bills are worry-free with HDL, Inc." because "if it turns out your insurance company does not cover a specific test, HDL, Inc. assumes all the risk." (Ex. F.)  This brochure provides a sample EOB that shows an amount labeled "Patient Responsibility," and it advises patients that "[y]ou DO NOT PAY the amount the insurance company says is the patient responsibility." (*Id.*)

56.     To take a simplified example, HDL might submit a claim to Cigna for $10,000 for services provided to a Cigna member. Assuming the entire amount was "allowable" under Cigna's plan, and the patient's coinsurance responsibility for out-of-network services is 40%, the patient would pay $4,000 to HDL and Cigna would pay the remaining $6,000 to HDL (assuming the patient had already met his or her deductible, and that no other limits applied). However, HDL waives this $4,000 patient responsibility and only seeks to collect the $6,000 from Cigna.

57.     Because no patient is actually paying based on HDL's listed "charges" to Cigna, patients have no incentive to moderate their demand for HDL's services or to consider the higher costs of any particular out-of-network service, leading to increased costs for the plan. Similarly, without co-insurance requirements, HDL has no incentive not to charge the plan astronomical rates, because the patients who choose to receive those services would not bear any more of the inflated cost.

58.     As other courts have noted, this makes the $10,000 amount submitted to Cigna a "phantom" charge, as HDL does not collect, and never intends to collect, the full amounts that it puts on the claim forms submitted to Cigna.

59.     Indeed, the charges HDL submitted to Cigna were highly inflated, with HDL often submitting "charges" that were often at least two to three (or more) times higher than Medicare rates for similar services.

60.     Consequently, HDL misrepresented its actual charges for the services rendered to Cigna affirmatively and through omission. As a result, Cigna relied on the amount that HDL billed to Cigna in its claim forms when processing and paying HDL's claims.

61.     Courts have repeatedly held in the context of "fee forgiving" that healthcare plans do not cover a provider's "charges" when that provider does not collect the patient's applicable cost-sharing responsibilities. *See, e.g.*, *Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 701 (7th Cir. 1991); *Biomed Pharms., Inc. v. Oxford Health Plans (NY), Inc.*, 522 F. App'x 81, 81-82 (2d Cir. 2013); *see also* HHS OIG Special Fraud Alerts (Dec. 19, 1994) (available at https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html) ("Routine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in … false claims … [and] excessive utilization of items and services paid for by

Medicare."); N.Y. D.F.S. Opinion 08-0404 "Re: Health Insurance, Waiver of Deductibles and Co-Insurance" (April 2, 2008) ("If a health care provider, as a general business practice, waives otherwise required co-insurance requirements, that provider may be guilty of insurance fraud."). These decisions are in accord with public policy as expressed by the Department of Health and Human Services, which has noted that "if patients are required to pay even a small portion of their care, they will be better health care consumers, and select items or services because they are medically needed rather than simply because they are free."  Department of Health and Human Services, Office of the Inspector General, Special Fraud Alert: Routine Waiver of Copayments and Deductibles Under Medicare Part B (May 1991).

62.     Any other interpretation would run contrary to the purpose of health insurance, which is to reimburse members for payments they actually make to providers, not to provide windfall payments to providers.

63.     Eliminating patients' responsibility to pay more towards out-of-network services also undermines Cigna's ability to offer quality in-network services. By charging patients nothing for out-of-network services, patients actually have an incentive to use HDL's higher cost services rather than lower in-network services. Without the incentive to use in-network services, providers will have a reduced incentive to join Cigna's network, leaving that network less robust and stripping employers of the ability to offer health care in an affordable way.

64.     HDL's practice of forgiving plan members' financial responsibility is exactly the sort of scheme certain states have declared illegal and enacted statutes to stop. *See* Colo. Rev. Stat. Ann. §18-13-119 (West 2011); Fla. Stat. § 817.234(7); Tex. Ins. Code. Ann. § 1204.055. In light of these statutes, HDL has indicated that it will cease its fee-forgiving activities in Florida and Colorado.

*HDL's Other Unlawful Conduct*

65.     Upon information and belief, HDL has adopted several other unlawful practices to increase its revenue from plans and plan administrators like Cigna.

66.     For instance, upon information and belief, HDL (either directly or through a sales agent) encourages physicians and other healthcare providers to order a litany of medical tests, regardless of whether the provider believes such tests are needed to diagnose or treat the patient, thus inflating the total charges that HDL submits to the patient's plan. HDL assures the providers that the patient will not complain if the patient's plan does not cover these tests because, pursuant to the fee-forgiving practices described above, HDL never bills its patients anything for the services at issue.

67.     Moreover, and also upon information and belief, HDL has paid providers fees in exchange for referring patients to HDL for testing, including patients who are members of Cigna-administered plans.

68.     In order to control healthcare costs, Cigna's contracts with its in-network providers require those providers to refer patients to other in-network providers and facilities for non-emergency services like the ones provided by HDL. Thus, by paying fees to providers to refer patients to HDL for testing, HDL has encouraged and has caused Cigna's in-network providers to violate the terms of their contracts with Cigna.

69.     Indeed, the United States Department of Health and Human Services' Office of Inspector General has investigated HDL in connection with the fees HDL pays to providers. On June 25, 2014, the Office of Inspector General issued a Special Fraud Alert stating that such payments by laboratories are not only improper, but also implicate the federal Anti-Kickback Statute.

*Cigna's Investigation of HDL*

70.    HDL never fully disclosed the true nature, extent and scope of its cost share waiver scheme to Cigna.

71.    Only through its own internal investigation did Cigna learn the existence of HDL's fee forgiving scheme.

72.    In the course of its investigation of HDL, Cigna came across the HDL brochures and flyers described above (*supra* ¶¶ 51-55) which indicated that HDL waived patient cost-sharing responsibilities.

73.    In order to confirm and better understand HDL's billing practices, in February 2013, Cigna's Special Investigations Unit ("SIU") began sending questionnaires to Cigna members who received HDL's services.

74.    These questionnaires asked the member to report how much they were billed by HDL.

75.    Cigna received responses from at least 27 members who received the questionnaires.

76.    Despite the fact that all of these members owed hundreds of dollars (and in some cases over $1,000) in cost-sharing responsibilities, HDL did not bill any of the 27 members **anything**.

77.    Several of these members confirmed that HDL accepted the plan's payment as payment in full.

78.    As described above, HDL's brochures and documents sought to affirmatively mislead and confuse patients about HDL's billing practices and the patients' health insurance benefits. (*Supra* ¶¶ 51-55.) HDL's patients' responses to Cigna's questionnaires further confirmed that HDL, as well as the doctors who saw Cigna patients and referred the patients to

HDL, provided the patients with false information about HDL's billing practices and the patients' health insurance benefits.

79.     For example, one HDL patient reported to Cigna that "my doc says that all the billing is refunded by HDL. They are trying to get their data more widely accepted."  Another HDL patient reported that the doctor's office told the patient not to pay any money to HDL "as it was covered" and "part of a pilot/test."

80.     The following are just two of the many examples demonstrating how HDL's fraudulent scheme operates.

81.     On or about March 19, 2012, HDL performed laboratory services for Patient A.

82.     HDL submitted a claim form to Cigna listing its charges as $1,484.00. These charges were more than double Medicare rates, which would have been approximately $723.00 for the services at issue.

83.     Based on HDL's representation, Cigna calculated Patient A's responsibility to be $707.52 under the patient's plan. However, HDL did not charge Patient A this amount. Instead, HDL charged Patient A ***nothing***.

84.     Cigna calculated the plan's responsibility to be $461.28 based on the charges submitted by HDL, and Cigna and paid this amount to HDL.

85.     Thus, as a result of the misrepresentations and material omissions contained within its claim, HDL induced Cigna to pay HDL $461.28.

86.     On or about August 24, 2012, HDL performed laboratory services for Patient B.

87.     HDL submitted a claim form to Cigna listing its charges as $2,979.00.

88.     Based on HDL's representation, Cigna calculated Patient B's responsibility to be $649.40 under the patient's plan. However, HDL did not charge Patient B this amount. Instead, HDL charged Patient B **_nothing_**.

89.     Cigna calculated the plan's responsibility to be $1,742.20 based on the charges submitted by HDL, and Cigna and paid this amount to HDL.

90.     Thus, as a result of the misrepresentations and material omissions contained within its claim, HDL induced Cigna to pay HDL $1,742.20.

91.     Upon information and belief, each of the many thousands of claims that HDL submitted to Cigna followed this pattern of fee forgiving.

92.     As the collective result of HDL's conduct, Cigna has paid HDL approximately $84 million in claims to date. A list of claims submitted by HDL to Cigna is attached as Exhibit A.

93.     Cigna deposited the funds to HDL via an electronic funds transfer (EFT) account with BB&T Bank. From 2010-2012, the bank routing number for the account was XXXXXXX20 and the bank account number was XXXXXXXXXX927. Beginning in 2012, the bank routing number for the account is XXXXXX260 and the bank account number is XXXXXXXXXX878. The bank address is 901 East Byrd Street, Suite 600, Richmond, VA 23219.

94.     HDL continues to submit claims to Cigna. Upon information and belief, HDL continues to waive the applicable out-of-network co-insurance, co-payment, and deductible responsibilities of Cigna plan members to entice Cigna plan members to use HDL's services, while simultaneously submitting exorbitant, fraudulent "charges" to Cigna.

95.     In addition, when Cigna contacted HDL to inquire regarding its billing practices, HDL took additional steps to conceal its improper billing practices from Cigna. For example, in response to a letter from Cigna questioning HDL's billing practices, on April 12, 2011, HDL's founder and former President and CEO Tonya Mallory falsely "assure[d] Cigna that HDL will not engage in a general practice of accepting as payment in full the payments made by Cigna where deductible or copayments apply."

96.     Ms. Mallory "also assure[d] Cigna that all claim forms and bills submitted to Cigna by HDL or on its behalf will indicate the actual charge for the services(s) provided."

97.     These and other similar misrepresentations by HDL concealed the true nature of its billing practices from Cigna.

## CAUSES OF ACTION

### Count I – Unjust Enrichment

98.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

99.     HDL has been unjustly enriched as a result of its fraudulent billing practices.

100.    Cigna's plans are required to cover some portion of the actual charges for services that plan members receive from out-of-network providers like HDL. Cigna's plans are not required to cover amounts that members are not billed, are not obligated to pay, or for which they would not have been billed if they did not have insurance. Neither are they required to cover a portion of a phantom charge that does not represent the amount the provider actually plans to collect. Cigna's plans are also not required to cover amounts that exceed the Maximum Reimbursable Charge, as that term is defined in the plans.

101.    HDL submitted benefit claim forms to Cigna falsely stating "charges" for services that were higher than the actual amounts that HDL required Cigna's plan members to pay for

those services. Based on these forms, Cigna processed benefits for services provided by HDL to Cigna plan members based upon these falsely-stated "charges." Cigna paid these benefits directly to HDL.

102.    When Cigna paid benefits to HDL that Cigna's plan were not obligated to cover, HDL obtained a benefit from Cigna by HDL's fraud in falsely stating "charges" for its services that were higher than the actual amounts that HDL required Cigna's plan members to pay for those services. Therefore, it would be inequitable for HDL to retain these benefits.  Specifically, HDL received payments of approximately $84 million from Cigna.

### Count II – Fraud

103.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

104.    HDL's conduct constitutes fraud.

105.    HDL had an independent duty under state and common law, beyond any obligation under the plans, to submit honest and accurate claims to Cigna regarding the value of the services provided to Cigna plan members.

106.    At the time HDL submitted claims to Cigna for reimbursement, HDL knew that the material statements and representations about its charges for services were false.

107.    HDL knew and intentionally failed to disclose material information regarding the manner, extent, and nature by which HDL waived Cigna members' required out-of-network co-payments, deductibles, co-insurance, and other patient cost-sharing responsibility for the services provided to plan members.

108.    HDL knew that the claims submitted to Cigna reflected false and inflated charges that HDL did not charge their patients. Exhibit A is a list of such claims, including the date when

HDL indicated to Cigna that it provided its services and the date that Cigna received HDL's claim.

109.    HDL submitted these claims to Cigna with the intent to defraud Cigna by inducing Cigna to rely on HDL's false representations and omissions alleged herein to pay these fraudulent charges.

110.    The misrepresentations were material, as Cigna must rely on claim forms submitted by providers like HDL, for, among other things, determining how much of the provider's charge is covered by the plan and how much the patient owes in cost-sharing responsibility.

111.    Cigna reasonably relied on such material false statements and omissions and paid the false and misleading claims submitted by HDL, resulting in compensable injury to Cigna.

112.    Moreover, as described above, when Cigna inquired with HDL regarding HDL's billing practices, HDL actively concealed the true nature of its billing practices.

113.    As a result of this conduct, Cigna and the plans at issue suffered significant damages. Specifically, as result of this conduct, HDL received payments of approximately $84 million from Cigna as a result of HDL's fraudulent conduct.  For fully-insured plans, Cigna paid HDL with Cigna's own funds, while for ASO plans, Cigna paid HDL on behalf of the plans.

**Count III – Negligent Misrepresentation**

114.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

115.    HDL's conduct constitutes negligent misrepresentation.

116.    HDL submitted benefit claim forms to Cigna regarding services that it provided to Cigna plan members; HDL did so in the course of its business and had a pecuniary interest in the

outcome of how Cigna processed benefits for those services, as any benefits for those services were paid directly to HDL.

117.    In submitting benefit claim forms to Cigna, HDL falsely stated "charges" for its services that were higher than the actual amounts that HDL required Cigna's plan members to pay for those services; HDL supplied this false information to guide Cigna in processing benefits for those services.

118.    In submitting benefit claim forms to Cigna, HDL did not identify the actual amounts that HDL required Cigna's plan members to pay for those services, only falsely-stated "charges" that were higher than these amounts; in so doing, HDL failed to exercise reasonable care or competence in communicating information regarding its charges to Cigna.

119.    Based upon the forms submitted by HDL, Cigna processed benefits for services provided by HDL to its members based upon the falsely-stated "charges" stated on the forms submitted by HDL; thus, each time Cigna processed a claim based upon a falsely-stated charge, it suffered a pecuniary loss because it justifiably relied on HDL's communications.  Exhibit A is a list of such claims, including the date when HDL indicated to Cigna that it provided its services and the date that Cigna received each of HDL's benefit claim forms.

120.    The misrepresentations were material, as Cigna must rely on claim forms submitted by providers like HDL, for, among other things, determining how much of the provider's charge is covered by the plan, and how much the patient owes in cost-sharing responsibility.

121.    Cigna reasonably relied on such material false statements and omissions and paid the false and misleading claims submitted by HDL, resulting in compensable injury to Cigna.

122.    Moreover, as described above, when Cigna inquired with HDL regarding HDL's billing practices, HDL actively concealed the true nature of its billing practices.

123.    As a result of this conduct, Cigna and the plans at issue suffered significant damages. Specifically, as result of this conduct, HDL received payments of approximately $84 million from Cigna as a result of HDL's conduct.  For fully-insured plans, Cigna paid HDL with Cigna's own funds, while for ASO plans, Cigna paid HDL on behalf of the plans.

**Count IV – Tortious Interference with Contract**

124.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

125.    HDL's conduct constitutes tortious interference with contract.

126.    Each of the members for whom HDL submitted benefits claims and received payment from Cigna received health care benefits pursuant to a benefit plan insured and/or administered by Cigna.

127.    Each of the plans pursuant to which HDL submitted claims and received payment contained, among other things, provisions that required the member to pay their cost-sharing responsibility (e.g., co-payments, co-insurance, and deductibles) in order for the plan to cover a portion of the submitted charges for services.

128.    HDL knew that its patients' plans required the patients to pay for a portion of the charges that HDL submitted to Cigna in the form of co-payments, co-insurance, and deductibles.

129.    Despite this knowledge, HDL engaged in a fee-forgiving scheme designed to bill Cigna and its ASO clients exorbitant charges, while waiving the portion of these charges that the patients were required to pay under the terms of their respective plans.

130.    As part of this scheme, HDL induced its patients to breach the terms of their plans with Cigna and Cigna's ASO clients by misleading those members about their healthcare

benefits, so that the members believed they did not have to pay the amounts that they were in fact required to pay under their contracts with Cigna and Cigna's ASO clients.

131.    HDL's scheme not only caused HDL's patients to breach the terms of their plans with Cigna and Cigna's ASO clients, allowing HDL to collect far more from Cigna than it was entitled to under the terms of the patients' plans, but also harmed Cigna's contractual relationship with its in-network providers and potential in-network providers by undermining and circumventing Cigna's provider network system, and upon information and belief, causing such providers to breach their contracts with Cigna.

132.    Specifically, as described above, upon information and belief, HDL paid referral fees to Cigna's in-network providers to encourage those providers to refer patients to HDL for testing, even though Cigna's contracts with its providers require the providers to refer patients to in-network providers for non-emergency services like the ones provided by HDL. Thus, HDL caused those in-network providers to breach the terms of their contracts with Cigna.

133.    HDL's tortious interference has caused damages to Cigna by causing it to make approximately $84 million in overpayments to HDL. HDL has caused further damages to Cigna by damaging its contractual relationship with members by misleading those members about the terms of their plans, and by causing Cigna's in-network providers to violate the terms of their contracts with Cigna by referring patients to HDL.

### Count V – Claim for Unfair and Deceptive Business Practices Under Connecticut's Unfair Trade Practices Act and Unfair Insurance Practices Act

134.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

135.    The Connecticut Unfair Trade Practices Act ("CUTPA") proscribes "unfair or deceptive acts or practices in the conduct of any trade or commerce."  HDL's conduct, described above, constitutes unfair or deceptive practices in trade and commerce. *See* CUTPA § 42-110b.

136.    HDL violated CUTPA by deceiving consumers into using its services through false representations about consumers' cost-sharing obligations and other responsibilities under Cigna-administered plans, thereby causing Cigna to pay tens of millions of dollars in false charges through HDL's fee-forgiving scheme.

137.    HDL knew that its patients' plans required the patients to pay for a portion of the charges that HDL submitted to Cigna in the form of co-payments, co-insurance, and deductibles.

138.    Despite this knowledge, HDL engaged in a fee-forgiving scheme designed to bill Cigna and its ASO clients exorbitant charges, while waiving the portion of these charges that the patients were required to pay under the terms of their respective plans.

139.    In violation of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-816, HDL made knowing misrepresentations to patients about the terms of their benefit plans and the significance of communications (such as EOBs) from plan administrators like Cigna. HDL also deceived Cigna by submitting false, grossly inflated charges to Cigna that did not reflect HDL's actual charges to patients.

140.    Indeed, while in-network providers sign contracts with Cigna whereby Cigna and the provider agree to specified rates for medical services, HDL has not entered Cigna's provider network which specifies the rates HDL may charge.

141.    HDL's fraudulent fee-forgiving scheme has and continues to harm Cigna's business.

142.    As a result of HDL's deceptive and unfair practices, Cigna and the plans at issue suffered significant injury and damages. Specifically, as result of this conduct, HDL received payments of approximately $84 million from Cigna as a result of HDL's deceptive and unfair practices.  For fully-insured plans, Cigna paid HDL with Cigna's own funds, while for ASO plans, Cigna paid HDL on behalf of the plans.

143.    In addition, upon information and belief, HDL paid referral fees to Cigna's in-network providers to encourage those providers to refer patients to HDL for testing, even though Cigna's contracts with its providers require the providers to refer patients to in-network providers for non-emergency services like the ones provided by HDL. Thus, HDL caused those in-network providers to breach the terms of their contracts with Cigna.

144.    HDL's conduct has caused damages to Cigna by causing it to make approximately $84 million in overpayments to HDL and by harming the relationship between Cigna and its plan members, as well as the relationship between Cigna and its in-network providers.

145.    HDL's unethical, unscrupulous, and immoral billing practices offend public policy, as set forth above, including state and federal laws and an AMA advisory opinion. Also as set forth in detail above, these practices have harmed Cigna, Cigna's plan members, and consumers by artificially inflating the costs of healthcare services generally.

### Count VI – Claim for Recovery of Overpayments Under ERISA § 502(a)(3), and for Injunctive Relief

146.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

147.    Cigna is a fiduciary as claims administrator of the ASO and fully-insured plans that it administers and seeks to recover overpayments made by those plans to HDL.

148.    The charges that HDL listed in claims forms submitted to Cigna for reimbursement on behalf of the members' plans did not represent the amount that HDL actually intended to require or accept as payment in full for its services.

149.    Specifically, HDL did not require plan members to pay their out-of-network cost sharing responsibility, which is required under the terms of the members' plans. HDL also represented to plan members that they would not be responsible for any other portion of HDL's "charges" that were not reimbursed by the plan.

150.    HDL's patients' plans expressly do not cover any portion of the charges that providers like HDL do not require plan members to pay, nor do they require the plan to cover anything in excess of HDL's normal charges to its patients.

151.    By paying HDL what HDL deceived Cigna into believing to be the covered portions of charges that HDL never, in fact, intended to collect in full, and, in connection with which, HDL never intended to charge for or collect the obligations of plan members, these plans overpaid HDL.

152.    These overpayments were made directly by Cigna to HDL.

153.    These overpayments belong in good conscience to the plans because the plans managed by Cigna made benefit payments to HDL for services provided to plan members based on the charges that HDL listed on the claim forms that it submitted to Cigna.

154.    The plan documents authorize Cigna to recover any overpayments made by the plans on the plans' behalves. This recovery provision creates an equitable lien by agreement over any overpayments made by Cigna. The provision puts plan members—and HDL, as the authorized recipient of these funds and/or their assignee—on notice that any overpayment made by Cigna will be recoverable (i.e., subject to a lien) as soon as the overpayment is made.

155.    These overpayments are within the possession and control of HDL and are specifically identifiable.

156.    These overpayments were made in contravention of plan terms.

157.    Cigna seeks recovery of these overpayments on behalf of the plans.

158.    Additionally, Cigna seeks a permanent injunction directing HDL to submit to Cigna only charges that HDL actually charges the plan member as payment in full for HDL's services and not to submit charges which include amounts that HDL does not actually require the member to pay (including, without limitation, the waiver of any portion of the members' required out-of-network co-insurance, co-payment, and deductible amounts).

### Count VII – Declaratory Relief

159.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

160.    Under the Declaratory Judgment Act, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

161.    HDL provides services to patients receiving medical care who are covered under employee health and welfare benefit plans that are insured or administered by Cigna.

162.    The claims that HDL submitted, and continues to submit, are claims for reimbursement for services provided to patients who are purportedly covered under employee health and welfare benefit plans that are insured or administered by Cigna.

163.    As described in the preceding paragraphs, the claims HDL submits are for charges that are not covered under the relevant plans because the claims are based on false charges submitted to Cigna, HDL failed to bill and collect the true out-of-network cost share

responsibility from the Cigna plan members, and HDL did not hold the plan members responsible for the amounts charged to Cigna.

164.    As a result, any claims submitted by HDL are not reimbursable, and any payments HDL received under such claims should be returned to Cigna.

165.    An actual controversy exists between HDL and Cigna regarding whether claims for reimbursement are covered and payable under employee health and welfare benefit plans that are insured or administered by Cigna.

166.    Cigna seeks a declaration that the claims for reimbursement submitted by HDL are not for covered services and are not payable under employee health and welfare benefit plans that are insured or administered by Cigna. Cigna also seeks a declaration that HDL must return all sums received from Cigna.

167.    Cigna also seeks recovery of its reasonable and necessary attorneys' fees and costs.

## JURY DEMAND
### (As to Non-ERISA Claims Only)

168.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

169.    With respect to Cigna's non-ERISA claims, Cigna hereby demands a trial by jury.

## PRAYER FOR RELIEF

Based on the foregoing, Cigna prays that the Court enter a judgment awarding the following:

        a.      a declaration that the products and services provided by HDL do not

                constitute covered services under the employee health and welfare benefit

                plans administered and/or insured by Cigna and that HDL is not entitled to

receive any payments on the claims for reimbursement that it has submitted or may submit in the future as part of the fee-forgiving practices described above in Paragraphs 48-69;

b.      return of any all monies paid to HDL on claims for reimbursement submitted by HDL;

c.      monetary damages for all harm suffered as a result of HDL's conduct;

d.      exemplary and punitive damages;

e.      pre-judgment and post-judgment interest;

f.      the reasonable and necessary attorneys' fees incurred;

g.      costs of court; and

h.      such other and further relief to which they may show themselves entitled in law or equity.

DATED this 16th day of January, 2015.

Respectfully submitted,

By: */s/ John C. Pitblado*
John C. Pitblado (ct25563)
James M. Sconzo (ct04571)
CARLTON FIELDS JORDEN BURT
One State Street, Suite 1800
Hartford, Connecticut  06103
Telephone:  860.392.5022
Facsimile:  860.392.5058
jpitblado@cfjblaw.com
jsconzo@cfjblaw.com

Joshua B. Simon*
Warren Haskel*
Ryan D. McEnroe*
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10016

Telephone:  212.446.4800
Facsimile:  212.446.4900

*Counsel for Plaintiffs*

*\* Admitted Pro Hac Vice*

## **CERTIFICATION**

I hereby certify that, on this 16th day of January, 2015, a copy of the foregoing was filed electronically.   Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.   Parties may access this filing through the court's CM/ECF System.


*John C. Pitblado*
John C. Pitblado